***********
Having reviewed the competent evidence of record and the positions of the parties, the Full Commission affirms the Opinion and Award of the deputy commissioner.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the deputy commissioner's hearing as
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Commission has jurisdiction over the parties and the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. Plaintiff suffered an injury by accident that arose out of and in the course of his employment with Perdue Farms Inc. on or about October 28, 1991.
5. An employment relationship existed between the parties on October 28, 1991, with Perdue Farms, the employer, and Randy Sheffield, the employee.
6. At all times relevant to this action, Perdue Farms Inc. was and is self-insured for purposes of meeting the requirements of the Workers' Compensation Act of the State of North Carolina.
7. At the time of Plaintiff's injury his average weekly wage was $438.75, and his compensation rate was $292.50.
8. As a result of his low back pain and low back surgery, Plaintiff missed the following periods from work: February 18, 1998 through May 2, 1998 (10.43 weeks) and September 15, 1998 through September 27, 1998 (1.71 weeks).
9. Plaintiff has received short-term disability benefits in the amount of $2,592.62 in gross benefits and $1,617.99 in net benefits through an Employer funded, non-contributory plan during the period of time set forth in the preceding paragraph.
10. A Form 21 agreement was entered between the parties on December 20, 1991.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. Plaintiff was born on June 10, 1963, and was 35 years of age on the deputy commissioner hearing date. He completed the eleventh grade. He began working for Perdue Farms as a maintenance technician in 1990.
2. On October 28, 1991, Plaintiff sustained an admittedly compensable injury by accident. On that date, Plaintiff was descending a ladder when a metal sprocket, weighing about 65 pounds fell a distance of three to four feet and struck him on the head and right shoulder. The impact broke the soft bump cap Plaintiff was wearing. Plaintiff did not lose consciousness but did "see stars." A co-worker grabbed him from behind and prevented him from falling.
3. The accident occurred between 12:30 a.m. and 1:30 a.m. Plaintiff stayed around the office and did not work until he saw the plant nurse later in the morning around 8 a.m. He complained of pain in his head, neck, right shoulder, and midline of his back, especially on the right. Plaintiff was then sent to the company physician, Dr. Harvey Wolf of Sandhills Urgent Care, who saw him the same day.
4. Dr. Wolf's examination showed that Plaintiff had symmetric reflexes in the upper and lower extremities. Plaintiff had tenderness along the trapezius and the spinal processes. X-rays showed no evidence of fracture. Dr. Wolf assessed a spinal contusion, took Plaintiff out of work, and prescribed a cervical collar and Valium and Percocet.
5. Dr. Wolf saw Plaintiff again on October 30, 1991, when he renewed Plaintiff's analgesics. On his November 4, 1991 visit, Plaintiff complained of increased paresthesia in his right hand. Dr. Wolf ordered a CT scan to rule out a fracture and then planned a course of vigorous physical therapy.
6. Plaintiff was referred to Dr. Malcom Shupeck, a neurosurgeon, who saw Plaintiff on November 4, 1991. Plaintiff complained of pain in the back of his head, his right shoulder and between his shoulder blades, and numbness and tingling in his ring and middle fingers of the right hand, and that both arms felt "heavy." Plaintiff also complained of pain down his mid-back, which Dr. Shupeck notes as the "kidney" area.
7. Dr. Shupeck ordered an MRI of the head and cervical spine. The MRI of the head was negative and the MRI of the cervical spine showed a bulging disk at C4-C5. Dr. Shupeck reviewed these results on November 7, 1993, when he found that Plaintiff was neurologically stable. Dr. Shupeck prescribed physical therapy and a medrol dosepack, with follow-up in three weeks.
8. Plaintiff returned to Dr. Shupeck on December 3, 1991, with complaints of headaches in the occipital area and shooting pains in his neck, and continued numbness in his fingers. Dr. Shupeck found Plaintiff was still improving, despite these complaints, and planned follow-up in six months. There is no mention of any lower back pain in Dr. Shupeck's notes of either the November 7 or December 3 visits.
9. Plaintiff returned to see Dr. Shupeck on January 14, 1992, with complaints of headaches all over his head, neck pain, and stiffness and coldness in his fingers. Again, there is no mention of low back pain in the notes of this visit. Dr. Shupeck continued Plaintiff's physical therapy and medications.
10. Plaintiff was seen again by Dr. Shupeck on February 18, 1992, with the same complaints, and no mention of lower back pain. Dr. Shupeck's assessment remained the same, that Plaintiff had a musculoskeletal injury, which was gradually improving.
11. Plaintiff continued in follow-up with Dr. Shupeck. Due to Plaintiff's continued complaints, in September 1992 Dr. Shupeck ordered a full body bone scan to look for any abnormalities. The bone scan was completely normal. Dr. Shupeck then referred Plaintiff to an orthopedic surgeon for evaluation of his ongoing shoulder and arm complaints.
12. On October 12, 1992, on referral of Dr. Shupeck, Plaintiff was examined by Dr. David DuPuy, orthopedic surgeon. Dr. DuPuy's exam revealed a lot of neck and back stiffness, with a very limited range of motion of the back of only twenty degrees. However, he found no radicular pain going into the arms or legs and no muscle spasm. Dr. DuPuy found no indications of a herniated disk in the lumbar area at that time, and it is his opinion there was no lumbosacral herniation at that time.
13. Plaintiff was seen again by Dr. DuPuy on July 29, 1993. Plaintiff's primary complaints were forgetfulness and a poor thought process. The focus of his physical complaints was neck and back pain, with no complaints of arm or leg pain. Plaintiff's range of motion had improved greatly to ninety degrees, which is almost normal. Dr. DuPuy diagnosed chronic cervical and lumbar pain with no evidence of nerve root involvement. As Dr. DuPuy has testified, the lack of radicular symptoms indicates that there was no herniated lumbar disk placing pressure on the nerve root at that time. Dr. DuPuy suggested a neurological evaluation of Plaintiff's potential head injury.
14. In October 1993, Alexander Manning, Ph.D., conducted a neuropsychological examination of Plaintiff. Dr. Manning administered a wide range of tests. The Wechsler Adult Intelligence Scale (WAIS) showed a full scale IQ of 77, in the borderline range of intelligence. Dr. Manning concluded that the test results did not suggest cerebral trauma, but were more likely attributed to a lifelong condition of the brain. Dr. Manning did find that Plaintiff appeared to be suffering from depression.
15. Plaintiff was also assessed by Dr. Thomas Gualtieri, a neuropsychiatrist, who saw him in August 1994. Dr. Gualtieri reviewed prior medical records and the results of the tests given by Dr. Manning. He declined to do further testing. Dr. Gualtieri acknowledged that Dr. Manning's interpretation of Plaintiff's deficits was valid, but he did not endorse that assessment nor make a different one. Rather, he determined that depression and chronic pain could account for some of Plaintiff's neuropsychological disability.
16. On October 19, 1993, Plaintiff was evaluated by Dr. Jack Young, a neurologist, for post-concussion headache syndrome and poor memory. An EEG study of the brain was normal. Dr. Young found no neurological deficit related to the head injury and released Plaintiff from his care. Plaintiff followed up with Dr. Young on December 22, 1994. Again, Dr. Young made no objective findings. Dr. Young concluded that Plaintiff had no organic dysfunction associated with a head injury and that his headaches were not related to the 1991 injury by accident.
17. Plaintiff came under the care of a family physician, Dr. Victoria Rommel, whom he first saw on March 29, 1995, for complaints of headache and backaches and a need for pain medication. Dr. Rommel prescribed medication and suggested further evaluation of the head injury. Her notes make no mention of any lower back or lower extremity problems.
18. On January 22, 1996, Plaintiff was examined by Dr. Scott Sanitate, a physiatrist. Dr. Sanitate has practiced physical medicine and rehabilitation since 1992 and is board certified in physical medicine rehabilitation and in electrodiagnostic medicine. Dr. Sanitate's examination showed no neurologic deficits. The cervical spine exam was essentially negative. The lumbar spine exam revealed increasing pain on far forward flexion. While Plaintiff had a cool right leg with decreased sensation, he had normal reflexes. Dr. Sanitate found give-way weakness in the upper and lower extremities. There was no evidence of spinal cord compromise or radicular compromise. Based upon this examination, Dr. Sanitate concluded that Plaintiff did not have any nerve root impingement or any herniated disk in his lumbar spine as of January 22, 1996.
19. Plaintiff returned to Dr. Sanitate on February 7, 1997, with complaints of increased right side low back pain with right lower extremity radiation after he had lifted some motors at work. During the deputy commissioner's hearing testimony, Plaintiff did not allege any new or distinct injury at that time. Plaintiff has never filed a claim for any new injury arising on or about that date. The Form 33 filed by Plaintiff on or about September 18, 1998, relates an injury date of October 28, 1991.
20. At the February 7, 1997, examination, Plaintiff still had a cool right leg. Forward flexion of the back was limited to sixty degrees. Straight leg raises were negative in the seated position. Plaintiff had mild increasing discomfort with extremes of the Patrick's maneuver. Dr. Sanitate still found no evidence of neurologic compromise. He administered a steroid injection to the back and told Plaintiff to follow-up with him in ten days.
21. At the February 18, 1997 visit, Plaintiff's lumbar spine symptoms had worsened slightly. Plaintiff now had a positive straight leg raising test in the supine position. Other tests were still equivocal, and Dr. Sanitate did not believe that surgical intervention was warranted at that time. He told Plaintiff to return in three weeks.
22. Plaintiff returned to Dr. Sanitate on March 12, 1997, and again on April 4, 1997, with continuing complaints of pain. Plaintiff had low back pain with radiation into his right leg, as well as shoulder and neck pain. At the April 4 visit, Plaintiff related that he had recently been a pallbearer at his grandmother's funeral and had resulting increased discomfort. According to Dr. Sanitate, given the increased symptoms following the pallbearer activity, this could have resulted in a herniated lumbar disk. Dr. Sanitate decided to perform a lumbar CT to rule out a disk herniation.
23. Dr. Sanitate reviewed this test at an April 18, 1997, visit. The CT showed a left sided L5-S1 disk herniation. Dr. Sanitate discussed with Plaintiff and his spouse the option of surgery versus conservative care. Dr. Sanitate left Plaintiff's work restrictions in place and told Plaintiff and his wife to think about their options and to give him an answer when they decided.
24. Plaintiff returned to Dr. Sanitate on June 16, 1997, with complaints of left sided back pain. At that time, they again discussed surgical intervention. Plaintiff informed Dr. Sanitate that he wanted to proceed with surgery and would follow up with Dr. Rommel for a surgical referral. Plaintiff has not returned to Dr. Sanitate since that date.
25. Based on a referral from Dr. Rommel, Plaintiff was seen by Dr. Mark Brenner, an orthopedic surgeon, for assessment of his herniated lumbar disk. Dr. Brenner first saw Plaintiff on August 28, 1997. Dr. Brenner's physical examination revealed decreased lumbar range of motion, with lumbar tenderness, but no muscle spasm or reflex loss. Dr. Brenner recommended an MRI. The MRI revealed a small paracentral disk protrusion at L5-S1.
26. Following discussion of his options with Dr. Brenner, Plaintiff chose to seek surgical intervention. Dr. Brenner referred Plaintiff to Dr. James Rice, an orthopedic surgeon who primarily treats lumbar back injuries. Dr. Rice has practiced orthopedics since 1984 and became board certified in orthopedic surgery in 1985.
27. Plaintiff first saw Dr. Rice on February 6, 1998. Dr. Rice's history is limited to Plaintiff's statement that "he has a long history of back problems from an injury in October 1991." Dr. Rice also records an incident from February 1997 where Plaintiff was lifting motors at work. Dr. Rice's examination revealed sciatic notch tenderness, limited motion, decreased lower extremity sensation, a cool right leg, and positive straight leg raising at forty-five degrees. Dr. Rice diagnosed a herniated disk at L5-S1 and recommended surgery.
28. On February 19, 1998, Plaintiff underwent surgery performed by Dr. Rice, a bilateral foraminotomy and laminotomy, with L5-S1 diskectomy. Surgery revealed a central left disk herniation. The herniated disk was calcified, which would indicate that the disc was not new, but could be 6 months or older.
29. Plaintiff initially had a good post-operative recovery. By May 1, 1998, he was released and returned to light duty. After this, Plaintiff's condition flared up and Dr. Rice prescribed a medrol dosepack and anti-inflammatories. As a result of this worsening in condition, on August 6, 1998, Dr. Rice ordered a repeat lumbar MRI. This MRI showed scarring and post-operative changes, but no evidence of recurrent disk herniation. Dr. Rice recommended an epidural steroid injection.
30. At the September 17, 1998, visit Plaintiff was still having back and leg pain. Dr. Rice switched to a different medication and recommended a repeat epidural steroid injection. He also took Plaintiff out of work for a week and then returned him to light duty. These restrictions stayed in effect through the October 15, 1998, visit.
31. Plaintiff returned to Dr. Rice on January 21, 1999, with continued complaints of back pain and increased problems in his legs. A lumbar x-ray revealed instability at the L4-L5 level. Dr. Rice prescribed use of a back brace, which by February 10, 1999, had provided limited relief.
32. Plaintiff returned to Dr. Rice on April 8, 1999, still complaining of back and leg pain. Dr. Rice recommended further diagnostic testing, which was done on June 7 and 8, 1999. The myelogram and lumbar discography showed an abnormality at the L5-S1 level. As a result, Dr. Rice discussed with Plaintiff the possibility of a lumbar fusion. Dr. Rice last saw Plaintiff on July 23, 1999, at which time Plaintiff's complaints of back and leg pain were worse. Dr. Rice again recommended fusion surgery. Although Dr. Rice has not seen Plaintiff since July 23, 1999, he wrote Plaintiff out of work from August 8 to August 22, 1999, based on Plaintiff's complaints of pain.
33. With respect to whether or not Plaintiff's herniated lumbar disk and subsequent surgery were related to his October 28, 1991, accident, both Dr. DuPuy and Dr. Sanitate offered consistent testimony that there was no causal connection between the two. The evidence shows that Plaintiff did not have a herniated lumbar disk as of July 29, 1993. The evidence further shows that Plaintiff did not have a herniated lumbar disk as of January 22, 1996. In contrast, on direct examination Dr. Rice gave the opinion that Plaintiff's herniated disc might be a progression from his compensable October 1991 injury. Further review of Dr. Rice's deposition, however, supports the conclusion that Plaintiff's herniated disc is not related to his 1991 injury. First, Dr. Rice admitted that he had only reviewed three prior medical records concerning Plaintiff — (1) a December 24, 1997 MRI; (2) an April 10, 1997 CT Scan; and (3) a February 3, 1998 report from Dr. Brenner — and that he was relying on Plaintiff's description that his lower back pain continually progressed from 1991 after his compensable injury. A review of Plaintiff's medical records from 1991 through 1997 fails to support the description that Plaintiff gave to Dr. Rice. Second, Dr. Rice conceded that Dr. Dupuy and Dr. Sanitate would have greater knowledge of Plaintiff's condition and whether he had evidence of a herniated disc from the 1991 injury because they saw Plaintiff closer to the alleged injury. Further, Dr. Rice stated that he would defer to Dr. Dupuy and Dr. Sanitate and that he had no evidence to contradict their opinion that Plaintiff did not sustain a lumbosacral herniated disc from his October 1991 injury. Dr. Rice also agreed with Dr. Dupuy that he would expect signs of a herniated disc to appear at least within 6 to 12 months post-injury. Therefore, the greater weight of the evidence is that Plaintiff's injuries from the compensable October 1991accident did not include a herniated disc or other significant injury to Plaintiff's lower back.
34. The greater weight of the evidence, including the testimony of Dr. DuPuy and Dr. Sanitate, fails to establish that the subsequent disk herniation at L5-S1, which was discovered in 1997, was caused by or was the natural consequence of the October 28, 1991 accident. The Plaintiff's herniated lumbar disk, for which he received medical treatment from Dr. Rice, is not related to his compensable accident of October 28, 1991. The evidence indicates that one of two intervening events may have precipitated the herniated lumbar disc, either the incident around February 1997 when Plaintiff lifted some motors at work, and for which no claim was filed, or the event around March/April 1997 when Plaintiff acted as a pallbearer. In addition, the evidence is that that condition could be idiopathic in origin.
35. Except for his periods out of work for surgery in 1998, Plaintiff has continued to work as a maintenance technician at Perdue. While his ability to lift is restricted and he does not climb ladders, he still sets up machines, adjusts machines, and assists other mechanics, which has always been a part of his regular job. Plaintiff can still perform most duties of his job satisfactorily. Ron Clark, Plaintiff's current supervisor, testified that, except for the restrictions on lifting and climbing, Plaintiff performs the regular maintenance technician job and does so satisfactorily.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following
 CONCLUSIONS OF LAW
1. The Industrial Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony. N.C. Gen. Stat. § 97-86; see Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912 (2000); Adams v. AVX Corp., 349 N.C. 676, 680,509 S.E.2d 411, 413 (1998). Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions removed from the ordinary experience of laymen, only an expert witness can give a competent opinion as to the nature of and the cause of the injury. Young v. Hickory Business Furniture, supra; Click v. PilotFreight Carriers, Inc., 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). Expert opinion that rests on speculation and conjecture is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of an injury or disease. Young v. Hickory BusinessFurniture, supra; Dean v. Carolina Coach Co., 287 N.C. 515, 522,215 S.E.2d 89, 94 (1975). The evidence fails to establish that Plaintiff's herniated lumbar disk is causally related to his compensable injury by accident of October 28, 1991. The evidence does not establish that the herniated disk was caused by or was the natural consequence of the accident of October 28, 1991. Therefore, Plaintiff's claim for additional benefits related to the herniated lumbar disk or any consequences thereof must be denied. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has not filed a claim concerning any new accident or aggravation of his back condition related to February 1997, when the evidence indicates he lifted some motors at work. Plaintiff has failed to timely file a claim for a new injury arising about February 1997 and any such claim is now barred by N.C. Gen. Stat. § 97-24.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Under the law, Plaintiff's claim for additional benefits related to his October 28, 1991, injury by accident is denied.
2. Defendant shall pay the costs, including the expert witness fees previously approved by Order filed December 7, 1999.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER